ALK:AP
F. #2023R00166

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

ANTONIO ROSARIO,                        Docket No. <u>23-CR-205 (PKC)</u>

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S MEMORANDUM OF LAW IN
<u>OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS AND
TO SUPPRESS EVIDENCE</u>

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Andrés Palacio
Assistant U.S. Attorney
    (Of Counsel)

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ III

PRELIMINARY STATEMENT ........................................................................................... 1

RELEVANT BACKGROUND ............................................................................................ 1

I.      The Defendant's Felony Criminal History ............................................................. 1

II.     The Offense Conduct ............................................................................................... 2

III.    Procedural Background............................................................................................ 6

        A.      The Defendant's Kings County Indictment ................................................. 6

        B.      The Defendant's Federal Indictment ........................................................... 6

I.      The Court Should Deny the Defendant's Motion to Dismiss the Indictment.................... 6

        A.      Undisturbed Second Circuit Precedent Holds That Section 922(g)(1) is
                Constitutional ............................................................................................... 8

        B.      Prohibitions on Felon Firearm Possession are Consistent With History and
                Tradition in the United States ..................................................................... 12

        C.      The Defendant's Convictions of Violent Felonies Bring Him Outside the Ambit
                of Persons Protected by the Second Amendment ................................................. 13

        D.      Felon Disarmament is Well-Supported by a Tradition of Disarming Individuals
                Viewed as Threats to Public Order ........................................................................ 13

II.     The Court Should Deny the Defendant's Motion to Suppress Evidence
        Without a Hearing.................................................................................................... 17

        A.      The Defendant's Arrest Complied With the Fourth Amendment......................... 17

                1.      Applicable Law ................................................................................ 17

                2.      Application........................................................................................ 19

        B.      The Court Should Deny the Defendant's Motion to Suppress Without a Hearing 23

CONCLUSION.................................................................................................................... 25

TABLE OF AUTHORITIES

Page(s)

CASES

Baze v. Reese,
    553 U.S. 35 (2008) .................................................................................................. 15

Binderup v. Att'y Gen. United States,
    836 F.3d 336 (3d Cir. 2016) ................................................................................... 14

Campiti v. Garland,
    2023 WL 143173 (D. Conn. Jan. 10, 2023) ........................................................... 15

District of Columbia v Heller,
    554 U.S. 570 (2008) .............................................................................. 7, 8, 12, 13, 14

In re Terrorist Bombings of U.S. Embassies in E. Africa,
    552 F.3d 157 (2d Cir. 2008) ................................................................................... 23

Graham v. Connor,
    490 U.S. 386 (1989) ................................................................................................ 18

Johnson v. Chambers,
    2021 WL 4484929 (2d Cir. Oct. 1, 2021) ................................................................ 8

McDonald v. City of Chicago,
    561 U.S. 742 (2010) .............................................................................................. 7, 8

Medina v. Barr,
    140 S. Ct. 645 (2019) ............................................................................................... 9

Medina v. Whitaker,
    913 F.3d 152 (D.C. Cir. 2019) ................................................................................. 9

Navarette v. California,
    572 U.S. 393 (2014) ........................................................................................... 17, 18

New York State Rifle & Pistol Ass'n, Inc. v. City of New York,
    140 S. Ct. 1525 (2020) ........................................................................................... 14

New York State Rifle & Pistol Association v. Bruen,
    142 S. Ct.  (2022) ...................................................................... 1, 6, 7, 11, 12, 13. 15

United States v. Patterson,
    25 F.4th 123 (2d Cir. 2022) .................................................................................... 18

People v. Graham,
    134 A.D.3d 1047 (2d Dep't 2015) ................................................................ 22

Range v. Att'y Gen. ("Range I"),
    53 F.4th 262 (3d Cir. 2022) ................................................................... 11, 14

Range v. Att'y Gen. ("Range II"),
    69 F.4th 96 (3d Cir. 2023) ................................................................... 11, 13

Richardson v. Ramirez,
    418 U.S. 24 (1974) ................................................................................... 12

Robertson v. Baldwin,
    165 U.S. 275 (1897) ............................................................................... 7, 8

Terry v. Ohio,
    392 U.S. 1 (1968) ............................................................................... 16, 17

United States v. Alston,
    No. 22-CR-178 (ENV), 2023 WL 6977055 (E.D.N.Y. Oct. 23, 2023) ...................... 9

United States v. Amodeo,
    71 F.3d 1044 (2d Cir. 1995) ..................................................................... 4, 5

United States v. Arvizu,
    534 U.S. 266 (2002) ................................................................................ 18

United States v. Ashburn,
    No. 13-CR-0303 (NGG), 76 F. Supp. 3d 401 (E.D.N.Y. 2014) ......................... 23

Untied States v. Bailey,
    743 F.3d 322 (2d Cir. 2014) ..................................................................... 18

United States v. Barnes,
    No. 22-CR-43 (JPO), 2023 WL 2268129 (S.D.N.Y. Feb. 28, 2023) ..................... 11

United States v. Bogle,
    717 F.3d 281 ......................................................................................... 6, 8

United States v. Bryant,
    711 F.3d 364 (2d Cir. 2013) ......................................................................... 7

United States v. Cortez,
    449 U.S. 411 (1981) ................................................................................ 18

United States v. Elmore,
    482 F.3d 172 (2d Cir. 2007) ..................................................................... 16

United States v. Gillette,
    383 F.2d 843 (2d Cir. 1967) ................................................................... 23

United States v. Hampton,
    No. 21-CR-766 (JPC), 2023 WL 3934546 (S.D.N.Y. June 9, 2023) .................................... 9, 10

United States v. Hightower,
    No. 19-CR-459 (LDH), 2020 WL 3489493 (E.D.N.Y. June 26, 2020) ................................... 20

United States v. Jackson,
    69 F.4th 495 (8th Cir. 2023) ........................................................... 7, 8, 13, 14, 15, 16

United States v. Jimenez,
    895 F.3d 228 (2d Cir. 2018) ................................................................. 8, 9, 12

United States v. King,
2022 WL 5240928 (S.D.N.Y. Oct. 6, 2022) ............................................................ 10

United States v. Mathurin,
    148 F.3d 68 (2d Cir. 1998) ..................................................................... 23

United States v. McCane,
    573 F.3d 1037 (10th Cir. 2009) .................................................................. 9

United States v. Ojudun,
    915 F.3d 875 (2d Cir. 2019) .................................................................... 16

United States v. Peguero,
    34 F.4th 143 (2d Cir. 2022) .................................................................. 9, 11

United States v. Peterson,
    No. 12-CR-409, 2012 WL 4473298 (S.D.N.Y. Sept. 28, 2012) ............................................ 17

United States v. Rowson,
    2023 WL 431037 (S.D.N.Y. Jan. 26, 2023) .......................................................... 15

United States v. Rozier,
    598 U.S. 768 (11th Cir. 2010) .................................................................. 9

United States v. Scroggins,
    599 F.3d 433 (5th Cir. 2010) ................................................................... 9

United States v. Sharpe,
  470 U.S. 675 (1985) ................................................................................. 18

United States v. Simmons,
  560 F.3d 98 (2d Cir. 2009) ...................................................................... 21

United States v. Spencer,
  No. 06-CR-413 (DLI), 2016 WL 6781225 (E.D.N.Y. Nov. 15, 2016) ..................... 23

United States v. Sternquist,
  No. 22-CR-473 (DLI), 2023 WL 6066076 (E.D.N.Y. Sept. 15, 2023) ..................... 10

United States v. Villegas,
  928 F.2d 512 (2d Cir. 1991) ...................................................................... 18

United States v. Ware,
  2023 WL 3568606 (S.D. Ill. May 19, 2023) .................................................. 15

United States v. Weaver,
  9 F.4th 129 (2d Cir. 2021) ...................................................... 17, 18, 21, 22

## STATUTES

18 U.S.C. § 922(g)(1) .................................................................................. 6, 8

New York Penal Law § 160.10(1) ...................................................................... 1

New York Penal Law § 110/125.25(1) ................................................................ 1

New York Penal Law § 205.15(2) ...................................................................... 1

New York Penal Law § 110/160.10 ................................................................... 2

New York Penal Law § 265.00(3)(a) ................................................................ 19

New York Penal Law § 120.14(1) .................................................................... 19

New York Penal Law § 265.01(1) .................................................................... 19

New York Penal Law § 265.03(1)(b) ................................................................ 19

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the defendant's motions to dismiss the indictment and to suppress evidence.  See ECF Nos. 11 ("Def. Mot. Dism."); 12 ("Def. Mot. Supp.").

The defendant is charged by indictment with possessing a firearm after having been previously convicted of a felony, in violation of Title 18, United States Code, Section 922(g)(1).  See ECF No. 1.  The defendant seeks dismissal of the indictment against him, arguing that the statutory dispossession of firearms from individuals convicted of felonies violates his Second Amendment right to keep and bear arms in the wake of the Supreme Court's decision in New York State Rifle & Pistol Association v. Bruen, 142 S. Ct. 1525 (2022).  Alternatively, the defendant argues that the Court should suppress the firearm recovered from him at the time of his arrest as the fruit of an allegedly unlawful stop and search.

For the reasons set forth below, the defendant's motions to dismiss the indictment and to suppress evidence should be denied without a hearing.

RELEVANT BACKGROUND

I.      The Defendant's Felony Criminal History

On October 22, 2014, the defendant was convicted in Queens County of second-degree robbery in violation of New York State Penal Law ("NYPL") § 160.10(1) and sentenced to a term of seven years' imprisonment.  In that case, the defendant brandished a firearm during the course of a violent robbery.  The defendant committed the instant offense while on parole for this robbery conviction.

On July 1, 2009, the defendant was convicted in Kings County of attempted second-degree murder in violation of NYPL § 110/125.25(1) as well as first-degree escape in

1

violation of NYPL § 205.15(2) and sentenced to concurrent terms of five years' imprisonment. In that case, the defendant shot a victim in the back and then tried to escape from Brooklyn Central Booking after apprehension by slipping out of his handcuffs.

On July 1, 2009, the defendant was also convicted in Kings County of attempted second-degree robbery in violation of NYPL § 110/160.10 and sentenced to a concurrent term of three years' imprisonment.

II.      The Offense Conduct[1]

On October 12, 2022 at approximately 3:10 p.m., the defendant entered a Dunkin Donuts store (the "Store") located at 272 Broadway in Williamsburg, Brooklyn and got into an argument with an employee ("Employee-1") over pumpkin donuts.  The defendant then left momentarily, but returned to the Store within seconds.

After the defendant walked back into the Store, a second employee ("Employee-2"), later reported to 911 that he saw the defendant "shove[] [a weapon] inside his pants" but that he could not see what type of weapon it was.  According to an NYPD chronology report (commonly referred to as a "Sprint Report"), Employee-2 made that 911 call at approximately 3:11 p.m.  See Ex. 1 (Sprint Report).  Employee-2 also reported that "[t]here's a guy here arguing for six donuts and I think that he brought a weapon inside trying to do something to the co-workers 'cause, can you guys come pretty quick because he has the weapon on him and I don't want no one to get harmed or hurt."  See Ex. 2 (Employee-2's 911 call recording); Ex. 3 (transcript of Employee-2's 911 call).

---

[1]      Unless otherwise indicated, all statements set forth in this memorandum are provided in sum and substance and in part.

2

When the operator asked Employee-2 if he knew what kind of weapon the perpetrator had, Employee-2 responded, "[n]o, because he shoved it inside his pants so I don't know if it's a knife or if it's a gun." Id. In that same call, Employee-2 advised the operator that the defendant was intoxicated and described him as "white but I think he's mixed with Spanish." Id. Employee-2 also provided the operator with Employee-2's complete name. Id. The 911 call was made contemporaneously with the incident because when the operator asked Employee-2 if the perpetrator was arguing with workers at the Store, Employee-2 responded "yeah, yeah he's still going. I just need you guys to come before [unintelligible]." Id. Towards the end of the call, the operator rhetorically added that she was "gonna put possible knife" in the incident description. Id. Employee-2 did not respond to that statement.

According to the Sprint Report, Employee-1 also called 911 at about 3:16 p.m., approximately five minutes after Employee-2 called. See Ex. 1. Employee-1 reported that the defendant was agitated and yelling at the employees over pumpkin donuts. See Ex. 4 (Employee-1's 911 call recording); Ex. 5 (transcript of Employee-1's 911 call). Employee-1 stated, "I don't know if he has any weapons on him because he has his hands in his pocket and he refuses to leave and he just keeps going back and forth." Id. Employee-1 also gave the operator a description of the defendant—tall white male, possibly 6'4," wearing all black—as well as her name and phone number. Id.

A dispatch operator ("Dispatch") initially received the report as a "10-52 with a knife" (a dispute with a knife) and broadcasted that information over the NYPD radio. See Ex. 6

3

(NYPD Radio Run); Ex. 7 (transcript of NYPD radio run)).[2]  Shortly thereafter, Dispatch

changed the incident report to a "52 with a firearm" (a dispute with a firearm) and transmitted

that information over the NYPD radio.  Id.  Seconds later, Dispatch traced Employee-2's phone

number and called Employee-2 to clarify what type of weapon the perpetrator had.  Id.

Employee-2 reported to Dispatch that "he [the perpetrator] had some type of weapon because

whatever he had he shoved it in his pants."  Id.  When Dispatch asked Employee-2 if it was a

knife or a gun, Employee-2 responded, "I couldn't tell because he had it discreet so I couldn't

tell."  Id.  Dispatch then communicated over the NYPD radio that Employee-2 was unsure if the

perpetrator had a knife or a gun.  Id.

    At approximately 3:17 p.m., Police Officer Jonathan Lebowitz and other officers

met with Employee-2 in front of the Store, where Employee-2 once again informed responding

officers that "[t]here was a tall guy threatening one of my co-workers but he's really, really

intoxicated."  See Ex. 8 at 1:10 (Officer Lebowitz body-worn camera recording).[3]  When officers

asked Employee-2 if he saw "anything," Employee-2 responded that "[w]hatever he had, he

shoved it in his pants quick and he was like 'oh so what you tryin' to do?' So that's why I called

---

[2]   Relevant portions of the radio run are transcribed from approximately 00:15 – 03:50.

[3]   The government seeks leave to seal Exhibit 8 (Officer Lebowitz's body-worn camera) and moves to seal Defense Exhibit A (a still frame from that body-worn camera), which was filed publicly by the defendant.  Exhibit 8 captures law enforcement's entire interaction with Employee-2 and Defense Exhibit A is a still frame from that recording depicting only Employee-2's image.  The government seeks leave to seal Exhibit 8 and moves to seal Defense Exhibit A in order to protect Employee-2's privacy and safety interests.  See United States v. Amodeo, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (third-party privacy interests may be a compelling reason justifying sealing).

you guys [police]." Id. at 1:35.  While relaying this to the officers, Employee-2 made a motion

as if he was thrusting something into his waistband to illustrate the defendant's actions in the

Store.  Id. at 1:30.  Employee-2 then pointed the officers in the direction where the defendant

went after leaving the Store and gave them a description of the defendant: a tall skinny white

male wearing all black.  Id. at 1:28 – 2:11.  The responding officers then communicated that to

other offices on scene and over the NYPD radio.  Id.

   Police Officer Gurjot Bhogal, one of the officers who responded to the Store and

heard the information conveyed by Employee-2, left to canvass the area for the perpetrator in his

police car.  Within one minute, Officer Bhogal saw a male fitting the defendant's description—a

tall white male wearing all black clothing—walking into the JMZ Deli at 296 Broadway (the

"Deli").[4]  According to Google Maps, the Deli is located approximately 191 feet from the

Store—several storefronts away from the Store.

   At approximately 3:19 p.m., eight minutes after Employee-2's initial 911 call,

Officer Bhogal's body-worn camera captured him getting out of his police car and following the

defendant into the Deli, where Officer Bhogal reached for the defendant's right arm as he and

other responding officers repeatedly warned the defendant not to reach for his waistband.  See

Ex. 9 at 1:00 – 1:55 (Officer Bhogal body-worn camera recording).  Officer Bhogal then frisked

the defendant's waistband and reached into that area to retrieve a 9mm semi-automatic firearm.

Id.  Other responding officers then placed the defendant in handcuffs.  Id.  The firearm was

---

  [4]  Officer Bhogal's police car is visible on the lefthand side of Officer Lebowitz's
body cam (see Ex. 8 at 2:13) reversing and then driving in the direction where the defendant
walked away from the Store as indicated by Employee-2.

loaded with a round in the chamber and 13 rounds in the magazine.  The defendant resisted arrest and was later charged with second-degree criminal possession of a weapon and other related charges.

A few minutes after the defendant's apprehension, Employee-2 arrived at the arrest scene with police officers and confirmed that the defendant had been the same man from the Store.

III.    Procedural Background

A.    The Defendant's Kings County Indictment

On November 3, 2022, the District Attorney of Kings County filed an indictment charging the defendant with second-degree criminal possession of a weapon and other related charges.

B.    The Defendant's Federal Indictment

On May 9, 2023, a grand jury sitting in this district, returned a single-count indictment charging the defendant with a violation of 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm.  See ECF No. 1.  On May 18, 2023, the defendant was arraigned on that indictment by the Honorable Marcia M. Henry, United States Magistrate Judge, Eastern District of New York, who entered an order of detention.  See ECF No. 6.  The defendant's Kings County indictment was later dismissed in lieu of the federal indictment.

ARGUMENT

I.    The Court Should Deny the Defendant's Motion to Dismiss the Indictment

The defendant argues that Section 922(g)(1)'s prohibition on possession of firearms by individuals who have previously been convicted of felonies violates the Second Amendment in light of the Supreme Court's decision in New York State Rifle & Pistol

6

Association v. Bruen, 142 S. Ct. 1525 (2022).  More specifically, the defendant argues that the indictment must be dismissed under the framework set forth in Bruen because he falls within "the people" protected by the Second Amendment, Def. Mot. Dism. at 6-9, and because Section 922(g)(1) is inconsistent with this country's historical tradition of firearm regulation, id. at 14.

These arguments fail.  First, the constitutionality of Section 922(g)(1) is supported by well-established Second Circuit precedent that has directly upheld the constitutionality of § 922(g)(1), see, e.g., United States v. Bogle, 717 F.3d 281 (per curium) (2d Cir. 2013), as well as several opinions from the Supreme Court that discuss them approvingly, see, e.g., District of Columbia v Heller, 554 U.S. 570, 626-27 (2008).  None of these cases were disturbed or undermined by Bruen and most post-Bruen lower courts have applied them as such.  See, e.g., United States v. Jackson, 69 F.4th 495, 502 (8th Cir. 2023).  Second, the defendant ignores the plethora of examples of this nation's "historical tradition of firearm regulation," Bruen, 142 S. Ct. at 2126, that support Congress's decision to restrict felons from possessing firearms.  As discussed in more detail below, early state legislatures routinely forbade certain groups from possessing arms, usually based on the perception that the groups threatened public order and stability, easily satisfying the historical requirement set out in Bruen.

The defendant has been convicted of four serious felonies including robbery and attempted murder.  He is not a "law-abiding, responsible citizen," id. at 2156, and federal law does not permit him to own a firearm.  Because the prohibitions set out in Section 922(g)(1) are supported by well-established precedent as well as a number of historical analogues, the Court should deny the defendant's motion to dismiss the indictment.

A.    Undisturbed Second Circuit Precedent Holds That Section 922(g)(1) is
      Constitutional

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.  This Amendment protects the right of law-abiding citizens to keep arms "in defense of hearth and home."  District of Columbia v. Heller, 554 U.S. 570, 635 (2008); see also McDonald v. City of Chicago, 561 U.S. 742, 786 (2010) (plurality opinion).  However, "like most rights, the right secured by the Second Amendment is not unlimited" and is enjoyed only by "law-abiding, responsible citizens."  United States v. Bryant, 711 F.3d 364, 369 (2d Cir. 2013) (quoting Heller, 554 U.S. at 626, 635); see also Robertson v. Baldwin, 165 U.S. 275, 281 (1897) (endorsing certain restrictions on the right to bear arms).  So long as it works within the constitutional bounds of the Second Amendment, the government may regulate the possession of weapons.  See McDonald, 561 U.S. at 786 ("the right to keep and bear arms is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (quoting Heller, 554 U.S. at 626)).

Section 922(g)(1) prohibits the possession of guns or ammunition by any individual "who has been convicted in any court of [] a crime punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 922(g)(1), which serves to keep firearms from individuals with a demonstrated proclivity to "[dis]obey the government and its laws, whether or not they ha[ve] demonstrated a propensity for violence."  Jackson, 69 F.4th at 502 (internal citation omitted).

The Second Circuit has held that Section 922(g)(1) is constitutional in Bogle, 717 F.3d at 281-82, a view endorsing the Supreme Court's naming of disarmament of felons as one

8

of several "presumptively lawful" regulations that would pass constitutional muster.  See Heller, 554 U.S. at 626-27 & 627 n.26 (2008); see also McDonald, 561 U.S. at 786 (same).  Nothing in the Bruen opinion abrogates the Second Circuit's prior holdings in Bogle and its progeny, which incorporated the safe harbor in Heller and McDonald into binding circuit precedent.  See, e.g., Bogle, 717 F.3d at 281; United States v. Jimenez, 895 F.3d 228, 231-34 (2d Cir. 2018); Johnson v. Chambers, 2021 WL 4484929 (2d Cir. Oct. 1, 2021).  The panels in these cases correctly viewed the Supreme Court's pronouncements on felon dispossession as a significant and unignorable part of the opinion.  This reasoning was not abrogated by Bruen.  Bogle, for instance, did not engage in the once-popular means-end analysis rejected by Bruen.[5]  The panel instead relied entirely on the safe harbor in Heller and McDonald, effectively transforming it into binding Circuit precedent. See United States v. Hampton, No. 21-CR-766 (JPC), 2023 WL 3934546, at *12 (S.D.N.Y. June 9, 2023) ("With Heller and McDonald still in full force after Bruen, Bogle remains binding precedent within this [Second] Circuit on the constitutionality of section 922(g).").

Moreover, lower courts applying both cases have treated them as if they were binding, see, e.g., Jimenez, 895 F.3d at 233 ("We have . . . relied on this passage to uphold the federal ban on ex-felon's access to firearms and ammunition."), and the Supreme Court has routinely denied certiorari when given a chance to overturn the near unanimity among the lower courts, see, e.g., Medina v. Barr, 140 S. Ct. 645 (2019), denying cert. to Medina v. Whitaker, 913

---

[5]     Other circuits have also upheld § 922(g)(1) without engaging in means-end analysis, albeit prior to Bruen.  See United States v. Scroggins, 599 F.3d 433, 451 (5th Cir. 2010); United States v. Rozier, 598 U.S. 768, 771 (11th Cir. 2010) (per curiam); United States v. McCane, 573 F.3d 1037, 1047 (10th Cir. 2009).

F.3d 152 (D.C. Cir. 2019). The Second Circuit was correct to rely on <u>Bogle</u>, and this circuit precedent remains binding law. <u>See</u> <u>United States v. Peguero</u>, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court." (citation omitted)).

Ultimately, <u>Bruen</u> is entirely consistent with prior Supreme Court and Second Circuit cases. While the Second Circuit has not yet decided a <u>Bruen</u> challenge to § 922(g)(1),[6] similar <u>Bruen</u> challenges have routinely failed in this District. <u>See</u>, <u>e.g.</u>, <u>United States v. Alston</u>, No. 22-CR-178 (ENV), 2023 WL 6977055, at *3 (E.D.N.Y. Oct. 23, 2023) ("Simply put, <u>Bogle</u> remains binding precedent in this circuit, and defendant's constitutional challenge to § 922(g)(1) fails as a consequence."); <u>United States v. Sternquist</u>, No. 22-CR-473 (DLI), 2023 WL 6066076, at * 6 (E.D.N.Y. Sept. 15, 2023) ("[T]his court joins the other district courts in this Circuit that have considered post-<u>Bruen</u> challenges to § 922(g)(1)'s constitutionality in light of <u>Bogle</u> in finding that 'nothing in <u>Bruen</u> [] alters the rationale of <u>Bogle</u>' and, '[w]ith <u>Heller</u> and <u>McDonald</u> still in full force after <u>Bruen</u>, <u>Bogle</u> remains binding precedent within this Circuit on the constitutionality of [§] 922(g)(1).'") (citing <u>Hampton</u>, 2023 WL 3934546, at *12); <u>United States v. Sims</u>, No. 21-CR-596 (CBA), ECF No. 43 (E.D.N.Y. July 18, 2023) (oral opinion) ("<u>Bruen</u> did not hold that felon-in-possession statutes were unconstitutional. In fact, <u>Bruen</u> . . . repeatedly characterized the right guaranteed by the Second Amendment as belonging to, quote, "law abiding citizens." . . . Furthermore, defendant's motion to dismiss must also be denied on the

---

[6]      This issue is pending in the Circuit in <u>United States v. Thawney</u>, 22-1399 (2d Cir.), and <u>Zherka v. Garland</u>, 22-1108 (2d Cir.).

basis of binding Second Circuit precedent alone."); <u>United States v. Augustin</u>, No. 22-CR-18

(DG), ECF No. 40 (E.D.N.Y. Dec. 7, 2022) (oral opinion) ("[T]he Supreme Court's decision in

<u>New York State Rifle and Pistol Association, Inc. vs. Bruen</u>—which defendant references in

connection with his motion to dismiss—did not hold the statutes at issue here to be

unconstitutional and does not provide a basis for this Court to disregard well established Second

Circuit law upholding the constitutionality of the statutes at issue here."); <u>see also</u> <u>United States</u>

<u>v. King</u>, No. 21-CR-255 (NSR), 2022 WL 5240928 at *4-5 (S.D.N.Y. Oct. 6, 2022) (rejecting

the challenge to Section 922(g)(1) as "meritless"); <u>Hampton</u>, 2023 WL 3934546, at *13 ("In

sum, binding Second Circuit precedent, which followed <u>Heller</u> and <u>McDonald</u>, holds that section

922(g)(1) is constitutional.  <u>Bruen</u> did not disturb this precedent."); <u>United States v. Barnes</u>, No.

22-CR-43 (JPO), 2023 WL 2268129, at *2 (S.D.N.Y. Feb. 28, 2023) (same).[7]

---

[7]        The lone circuit court to find that an application of § 922(g)(1) violated the
Second Amendment was the Third Circuit in <u>Range</u>, which overturned prior circuit precedent
that upheld felon-possession prohibitions as applied to the petitioner in that case.  <u>Range v. Att'y</u>
<u>Gen.</u> (hereafter "<u>Range</u> <u>II</u>") 69 F.4th 96 (3d Cir. 2023) (en banc), <u>overruling</u> <u>Range v. Att'y Gen.</u>
(hereafter "<u>Range</u> I"), 53 F.4th 262 (3d Cir. 2022) (per curiam).  The <u>Range</u> <u>II</u> opinion strikes
down Section 922(g)(1) as unconstitutionally applied—but it does so narrowly, and under
different circumstances.  Indeed, the defendant in <u>Range</u> <u>II</u>, for instance, was never convicted of
a felony.  The crime at issue in that case—making false statements in an application for food
stamps—was classified as a misdemeanor under Pennsylvania law and only fell within the scope
of § 922(g)(1) because it carried a possible sentence of up to five years' imprisonment.  <u>Range</u> <u>II</u>,
69 F.4th at 98-99.  The defendant there was sentenced to probation and never served any time in
prison.  <u>Id.</u>  The Third Circuit viewed this prior conviction as lacking the requisite severity to
justify a deprivation of his right to keep and bear arms.  <u>See id.</u> at 102.  The Third Circuit's
decision, however, does not bind this Court and does not abrogate the Second Circuit's
controlling precedent in <u>Bogle</u>.  <u>See</u> <u>Peguero</u>, 34 F.4th at 158.

B.      Prohibitions on Felon Firearm Possession are Consistent With History and
        Tradition in the United States

Though the Court need not engage in any further analysis, the defendant's motion also fails under the framework laid out in Bruen.  Bruen replaced the means-end analysis utilized by many circuit courts with a test that requires the government to "affirmatively prove its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127.  In cases where the Second Amendment encompasses an individual's conduct, the government bears the burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation."[8] Id. at 2130.

As to the scope of the inquiry, Bruen instructs that if a law is intended to rectify a "general societal problem" dating back to the Founding-era, the government must identify appropriate historical analogues that similarly burdens the right to armed self-defense.  Id. at 2131-33.  The Bruen Court, as well as the Heller Court before it, both considered a range of historical materials that focused on English history, American history before and just after the Founding, as well as certain post-ratification processes into the early nineteenth century.  See id. at 213; Heller, 554 U.S. at 595.  An examination of these materials demonstrates that there is a significant number of close historical analogues for prohibiting felons from owning weapons.

---

[8]      It is unclear that this historical analysis is even necessary for felon-in-possession laws.  Bruen requires the government to identify a reasonable comparable historical analogue in an inquiry into "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Bruen, 142 S. Ct. at 2133 (emphasis added).

C.      The Defendant's Convictions of Violent Felonies Bring Him Outside the Ambit
        of Persons Protected by the Second Amendment

As discussed above, felons do not fall within the definition of "people" protected by the Second Amendment.  The Amendment's protections extend to "ordinary, law-abiding citizens," Bruen, 142 S. Ct. at 2134, (unlike the defendant) who are entitled to be "members of the political community Heller, 554 U.S. at 580.  The right of convicted felons to keep and bears arms is not protected by the Second Amendment.  Jimenez, 895 F.3d at 238.

The same has been true throughout American history.  Congress and state legislatures have historically had wide latitude to exclude felons from the "political community" as a result of their convictions, and many of these restrictions have been matters of settled law for decades.  For instance, many felons lose their right to serve on a jury, receive government benefits, hold public office, travel freely, or even the right to vote.  See, e.g., Richardson v. Ramirez, 418 U.S. 24 (1974) (upholding the disenfranchisement of felons).  The prohibition on felony possession fits squarely within this vein of acceptable collateral consequences for convicted felons.  Because the defendant is not a "law-abiding citizen" and has "demonstrated disrespect for legal norms of society"—including commission of the instant crime while on parole for robbery and a prior conviction for attempted murder—he does not enjoy the protections of the Second Amendment.  See Jackson, 69 F.4th at 504.

D.      Felon Disarmament is Well-Supported by a Tradition of Disarming Individuals
        Viewed as Threats to Public Order

There is also ample historical evidence for disarming individuals viewed as threats to public order and stability.  While the defendant argues that the government cannot point to any historical analogues to § 922(g)(1), which seeks to disarm convicted felons, the contrary is true.

13

The "predecessor to our Second Amendment" was the 1689 English Bill of Rights, which protected the right to bear arms.  Bruen, 142 S. Ct. at 2141 (quoting Heller 554 U.S. at 593).  Parliament enacted the Bill of Rights in 1689 and around the same time enacted a number of additional regulations on the possession of weapons.  This included outright bans for members of certain groups, indicating that the text of the English Bill of Rights did not prohibit certain forms of dispossession.  In the midst of religious tension, for example, the Crown banned practicing Catholics from "hav[ing] or keep[ing]" any kind of "Arms[,] Weapons[,] Gunpowder[,] or Ammunition" without special permission.  See 1 W. & M., Sess. 1, c.15, in 6 The Statutes of the Realm 71-73 (1688).  The provision reflected Parliament's view that this group would have disrespect for and disobedience to the Crown and applied to all Catholics, regardless of any risk of violence.  See Range II, 69 F.4th at 120-22 (Krause, J., dissenting) (providing additional context).  In enacting Section 922(g)(1), Congress employed similar reasoning, disarming "persons who have demonstrated disrespect for legal norms of society." Jackson, 69 F.4th at 504.

In the United States, early legislatures passed laws that criminalized gun possession by those whose actions demonstrated a disrespect for the law, a step viewed as necessary to protect "an orderly society and compliance with its legal norms."  Jackson, 69 F.4th at 503 (quoting Range I, 53 F.4th at 281-82).  During the Revolution, for example, the Continental Congress recommended that state governments disarm individuals with questionable loyalty to the United States, a call that was heralded by the legislatures of several of the original thirteen states.  1 Journals of the Continental Congress, 1774-1778, 285 (1906); see Joseph Greenlee, The Historical Justification for Prohibiting Dangerous People from Possessing Arms, 20 Wyo. L. Rev. 249, 262-65 (2020) (discussing in detail the seizure of arms from

14

Revolutionary-era Loyalists in several colonies).  Dispossession was also imposed as penalty for relatively minor offenses, such as hunting illegally, by early state legislatures.  See Act of Apr. 20, 1745, ch. III, 23 The State Records of North Carolina 218-19 (1904); see also Jackson, 69 F.4th at 503, 505 (discussing other examples).

        In addition, many of the debates surrounding the ratification of the Constitution also illustrate that early Americans believed that potentially dangerous individuals forfeited their right to keep and bear arms.  The minority report from the Pennsylvania delegation—later viewed by the Heller Court as "highly influential" in the final language of the Second Amendment, 554 U.S. at 604—stated that the government cannot infringe one's right to keep and bear arms, "unless for crimes committed, or real danger of public injury from individuals." Jackson, 69 F.4th, at 503 (emphasis added).  This demonstrates that "members of the Founding generation viewed [c]rimes committed—violent or not—[as] . . . an independent ground for exclusion from the right to keep and bear arms." Binderup v. Att'y Gen. United States, 836 F.3d 336, 349 (3d Cir. 2016); see also New York State Rifle & Pistol Ass'n, Inc. v. City of New York, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas & Gorsuch, JJ., dissenting) (recognizing that "history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals").

        As these laws sought to disarm individuals viewed as threats to the public order, they are comparable to Section 922(g)(1)'s prohibition on felon possession.  While the changing

understanding of felonies over time make an exact historical duplicate unworkable to cite,[9]

Bruen requires only a "comparable tradition of regulation" that "impose[s] a comparable burden"

to Second Amendment rights.  Bruen, 142 S. Ct. at 2131-33.  Because early-American

legislatures possessed and routinely utilized the power to ban certain groups from owning

weapons, § 922(g)(1)'s prohibition on felon possession is "analogous" to historical examples,

Jackson, 69 F.4th at 504, and clearly passes constitutional muster.  Courts that have undergone

extensive historical inquiries have concluded the same.  See, e.g., United States v. Rowson, 2023

WL 431037, at *17 (S.D.N.Y. Jan. 26, 2023) (explaining that "post-Bruen decisions addressing

the federal felon-in-possession statute" have "uniformly up[held] that statute . . . "); United

States v. Ware, 2023 WL 3568606 (S.D. Ill. May 19, 2023) (finding consistency with history and

tradition); Campiti v. Garland, 2023 WL 143173, at *4 (D. Conn. Jan. 10, 2023) (same);

Jackson, 69 F.4th at 503-05 (same).

   The only post-Bruen circuit to review § 922(g)(1) as applied to an individual

convicted of more serious crimes was the Eighth Circuit in Jackson, which examined the

historical record and found ample support for felon dispossession.  There, as here, the defendant

---

   [9] "Felony," as it is commonly understood today, is a relatively recent innovation
and was certainly understood differently at the time of the founding.  William Blackstone
defined "felony" as "an offense which occasions a total forfeiture of either lands, or goods, or
both, at the common law, and to which capital or other punishment may be superadded,
according to the level of guilt."  See 4 William Blackstone, Commentaries on the Laws of
England 95 (Harper ed. 1854).  As modern criminal codes did not yet exist, historically, courts
instead relied on traditional common-law principles, and punishment was often swift and harsh.
"[T]he standard penalty for such crimes" was capital punishment, even for some offenses that
seem relatively minor today.  Baze v. Reese, 553 U.S. 35, 94 (2008) (Thomas, J., concurring)
(citation omitted).  As modern, long-term prison facilities did not develop until much later,
today's understanding of "felony" as a specific and clearly delineated category of crimes makes
little sense in the historical context.

had been convicted of multiple felonies and served a lengthy prison sentence. See id. at 498. Because of the serious nature of his prior convictions, the Eighth Circuit's reasoning in Jackson is certainly analogous to the present case, where the defendant has been convicted of numerous violent felonies including second-degree robbery and attempted second-degree murder.

II.     The Court Should Deny the Defendant's Motion to Suppress Evidence Without a Hearing

Officer Bhogal properly relied on a reasonable suspicion to believe that the defendant was armed with a weapon based on the information conveyed by Employee-2 on three separate occasions to law enforcement and the short length of time from Employee-2's original report until the defendant's apprehension. Similarly, based on a report that in addition to possibly being armed, the defendant was also intoxicated, Officer Bhogal also had a reasonable basis to be concerned for his safety and those around him and to frisk the defendant's waistband.

A.     The Defendant's Arrest Complied With the Fourth Amendment

1.     Applicable Law

Under Terry v. Ohio, 392 U.S. 1 (1968), police may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot, and may frisk him if they reasonably believe he is armed and dangerous." United States v. Elmore, 482 F.3d 172, 179 (2d Cir. 2007); see also United States v. Ojudun, 915 F.3d 875, 882 (2d Cir. 2019) (explaining that "[i]t is well established that" a law enforcement officer "may subject an individual to an investigative stop upon a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity"). "To sustain a stop, police 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion [on a citizen's liberty interest].'" United States v. Peterson, No. 12-CR-409, 2012 WL 4473298, at *6 (S.D.N.Y. Sept. 28, 2012), aff'd, United States v.

17

Peterson, 559 F. App'x 92 (2d Cir. 2014) (quoting Terry, 392 U.S. at 21).  "And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry, 392 U.S. at 21-22.

The Second Circuit affirmed that "[t]he reasonable suspicion standard is not high." United States v. Weaver, 9 F.4th 129, 140 (2d Cir. 2021).  The Supreme Court instructs that "[t]he 'reasonable suspicion' necessary to justify such a stop is dependent upon both the content of information possessed by police and its degree of reliability.  The standard takes into account the totality of the circumstances—the whole picture.  Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." Navarette v. California, 572 U.S. 393, 397 (2014) (internal quotation marks and citations omitted).  Importantly, "these principles apply with full force to investigative stops based on information from anonymous tips." Id.  In Navarette, the Supreme Court held that "sufficient reliable" anonymous tips can create reasonable suspicion. Id. at 397-98.  The Supreme Court identified four indicia of reliability: (1) a basis to think that the caller had "eyewitness knowledge" of the incident, (2) a basis to think that the call was a "contemporaneous report," (3) a basis to think that the call reported a "startling event" and (4) knowledge that the caller had used "the 911 emergency system." Id. at 399-401.  The Navarette Court held that "eyewitness knowledge" "lends significant support to the tip's reliability"; contemporaneous reports are "especially reliable"; reports of a "startling event" also "weigh in favor of the caller's veracity"; and the "caller's use of the 911 system" is a "relevant circumstance[]" helping to justify "the officer's reliance" on the call information. Id.

18

The standard also recognizes that police "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving"—and "need not ignore developments" in "swiftly developing situation[s]." Weaver, 9 F.4th at 140-41 (alteration in original) (first quoting Graham v. Connor, 490 U.S. 386, 397 (1989), and then quoting United States v. Sharpe, 470 U.S. 675, 686 (1985)). Police may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). Police need not "eliminate 'all possible innocent explanations' for conduct before deeming it suspicious." United States v. Patterson, 25 F.4th 123, 136 (2d Cir. 2022) (quoting Untied States v. Bailey, 743 F.3d 322, 333 (2d Cir. 2014)); see also Arvizu, 534 U.S. at 274-75 (explaining that Terry precludes lower-court "divide-and-conquer analysis" by piecemeal rejecting police observations as each "readily susceptible to an innocent explanation," and that Terry itself involved a series of "perhaps innocent" acts—individuals "repeatedly walk[ing] back and forth, look[ing] into a store window, and confer[ring] with one another"—that, taken together, "warranted further investigation"); United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991) ("Conduct consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity.").

## 2. Application

In this case, the circumstances, when viewed as a whole, demonstrate that Officer Bhogal had reasonable suspicion that the defendant was engaged in criminal activity and that he was armed and dangerous.

As to the stop, Officer Bhogal had a detailed description of a suspect who had menaced civilian employees with a weapon (either a gun or a knife).  Specifically, Officer Bhogal knew that the suspect was dressed in all black, was tall and was white or possibly Hispanic.  Officer Bhogal then located the defendant less than 200 feet away from the Store, at a deli located in the direction Employee-2 informed him the suspect went, mere minutes after the suspect had left the Store.  The defendant was dressed in all black and, according to arrest pedigree, is 6'6" feet tall.

Officer Bhogal accordingly had reasonable suspicion that the defendant was the suspect described by Employee-2 and had committed and was committing, among other crimes, second-degree criminal possession of a weapon, in violation of New York Penal Law § 265.03(1)(b) and (3); fourth-degree criminal possession of a weapon, in violation of New York Penal Law § 265.01(1); and second-degree menacing, in violation of New York Penal Law § 120.14(1).[10]

---

[10]     In relevant part, section 265.03 of the New York Penal Law criminalizes, under subsection (1)(B), the possession of a "loaded firearm" with the "intent to use the same unlawfully against another" and, under subsection (3), the possession of "any loaded firearm" outside of a person's "home or place of business."  Section 265.01 also criminalizes, under subsection (1), the possession of "any firearm . . . switchblade knife, pilum knife, metal knuckle knife . . . . "  A "firearm" under New York State law includes "any pistol or revolver," and a "loaded firearm" is "any firearm loaded with ammunition or any firearm which is possessed by one who, at the same time, possesses a quantity of ammunition which may be used to discharge such firearm."  N.Y. Penal Law § 265.00(3)(a), (15).  Meanwhile, section 120.14(1) bans intentional placing or attempting to place "another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon . . . or what appears to be a pistol, revolver, . . . or other firearm."

Officer Bhogal was also reasonable in relying on the information provided by Employee-2. Not only was Employee-2 a verified individual (not an anonymous tipster) but all of the indicia of reliability cited by the <u>Navarette</u> Court were also present. <u>See United States v. Hightower</u>, No. 19-CR-459 (LDH), 2020 WL 3489493, at *3 (E.D.N.Y. June 26, 2020) ("[W]hether a tipster is anonymous is not, in and of itself, dispositive of whether reasonable suspicion exists. The inquiry must rightfully focus on corroboration."). Employee-2 had three interactions with police in less than six minutes: (1) the initial 911 call placed by Employee-2; (2) the conversation he had with Dispatch after the operator traced Employee-2's number and called him to ask additional detail; and (3) the in-person interaction with responding officers captured on body-worn camera in front of the Store. The information conveyed each time by Employee-2 to police was largely consistent with one another. There is no material dispute that Employee-2 had "eyewitness knowledge" of the incident because his 911 call was placed contemporaneously as the defendant aggressively harassed him and his co-workers over pumpkin donuts. Employee-1 and Employee-2 both made their calls as the defendant was in the Store and menacing the employees.

Additionally, the motive for making the 911 call by Employees-1 and -2 was to promptly report a "startling event." In his 911 call, Employee-2 stated, "[t]here's a guy here arguing for six donuts and I think that he brought a weapon inside trying to do something to the co-workers 'cause, can you guys come pretty quick because he has the weapon on him and I don't want no one to get harmed or hurt." <u>See</u> Ex. 2, 3. He reiterated that concern when he met police in person several minutes later and told them, "[t]here was a tall guy threatening one of my co-workers." <u>See</u> Ex. 8 at 1:14. Employee-2's description of the incident was also largely corroborated by Employee-1's 911 call. <u>See</u> Ex. 4, 5. Based on the defendant's threatening

21

behavior towards the Store's employees and his action of thrusting an objection into his waistband (a grabbable area where guns and knives are commonly concealed), Employee-2 reasonably believed that the defendant was armed and reasonably feared for everyone's safety. His fear was not diminished (or any less credible) because he did not actually see a weapon in the defendant's possession. The defendant's actions were intended to make the Store's employees believe that he was armed and certainly warranted further investigation by police.

A reasonable officer in Officer Bhogal's shoes could reasonably suspect "an ongoing emergency" based on the call of a dispute of an individual with a possible weapon. United States v. Simmons, 560 F.3d 98, 108 (2d Cir. 2009). In Simmons, police were responding to a dispatch "of an assault in progress, possibly involving a weapon." Simmons, 560 F.3d at 107. Police did not find "evidence of an assault in progress" at the scene but confirmed that the defendant was at the scene and his "appearance matched the description of the suspect." Id. at 107-08. Despite the fact that the defendant did not appear "threatening," the Second Circuit found reasonable suspicion. Id. at 108. As the Second Circuit has held, an "emergency 911 call" giving rise to the police investigation is "accorded a higher degree of reliability" than other 911 calls. Id. at 108. Viewed as a whole, Officer Bhogal could "point to specific and articulable facts which, taken together with rational inferences from those facts, would lead a "reasonable and cautious police officer on the scene" to believe the defendant "was involved" in menacing the Store's employees with a dangerous weapon. See Weaver, 9 F.4th at 139-40.

As to the frisk, for substantially similar reasons, Officer Bhogal had a reasonable basis to think that the defendant was armed and dangerous. Specifically, as detailed above, Officer Bhogal had information that the defendant was intoxicated, possessed a weapon of some

22

kind and had threatened multiple people with that weapon.  Accordingly, Officer Bhogal could

"point to specific and articulable facts which, taken together with rational inferences from those

facts," would lead a "reasonable and cautious police officer on scene" to believe that the

defendant was "armed and dangerous."  Id.  Indeed, that reasonable belief is evidenced by the

fact that Officer Bhogal and other officers repeatedly warned the defendant not to reach for his

waistband.  Additionally, the report that the defendant was intoxicated certainly heightened

Officer Bhogal's concern for his safety and that of others around him.  Moreover, the scope of

Officer Bhogal's frisk was reasonable because it was limited to frisking the defendant's

waistband and immediately removing the firearm from the defendant's waistband.  The frisk

comported with the Fourth Amendment.

Finally, the defendant's reliance on People v. Graham, 134 A.D.3d 1047 (2d

Dep't 2015), is unpersuasive and misplaced.  See Def. Mot. Supp. at 6-7.  Unlike the encounter

here, there is no indication that police in Graham approached the defendant after receiving

information from a verified informant that the defendant had a weapon.  Id.at 1048.  The court in

Graham also found that the protective measures taken by police were unreasonable under the

circumstances because the officer searched the defendant's jacket pocket without any "prior

visual observations of a weapon and without first conducting a pat down of the outside of the

pocket."  Id.  Here, Officer Bhogal reasonably believed that the defendant might be armed and

body-worn camera showed that he confined his frisk to the defendant's waistband based on

earlier reports that the defendant had possibly secreted a weapon in that specific area.

    B.    <u>The Court Should Deny the Defendant's Motion to Suppress Without a Hearing</u>

Finally, the defendant's motion to suppress the evidence should be denied without

a hearing.  A defendant has no absolute right to an evidentiary hearing on a motion to suppress

evidence.  See In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 157, 165

(2d Cir. 2008) ("[A]n evidentiary hearing on a motion to suppress ordinarily is required if the

moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court

to conclude that contested issues of fact going to the validity of the search are in question."

(internal quotation marks and citation omitted)).  A material factual dispute must exist for a

hearing to be justified.  See United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967) (holding

that suppression hearing is available only if there is a "factual issue to be resolved"); United

States v. Ashburn, No. 13-CR-0303 (NGG), 76 F. Supp. 3d 401, 436 (E.D.N.Y. 2014)

("defendant must show that disputed issues of material fact exist before an evidentiary hearing is

required).  "If the defendant's request for a hearing is not accompanied by a sufficient

'specification of the factual basis for the characterization, the district court is not required to have

a hearing.'"  United States v. Spencer, No. 06-CR-413 (DLI), 2016 WL 6781225, at *5

(E.D.N.Y. Nov. 15, 2016) (quoting United States v. Mathurin, 148 F.3d 68, 69 (2d Cir. 1998)

(per curiam) (alteration omitted)).

   Here, the defendant has failed to identify a material factual dispute requiring a

hearing.   To the contrary, all of the information giving rise to the officers' reasonable suspicion

to stop the defendant was captured on either audio or video and all of the officers' interactions

with the defendant were caught on Officer Bhogal's body-worn camera.  In short, the material

facts in this case are not in dispute.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the defendant's motions to dismiss the indictment and to suppress evidence should be denied.

Dated:      Brooklyn, New York
            December 15, 2023

                                        Respectfully submitted,

                                        BREON PEACE

                                        United States Attorney

                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                              By:      /s/ *Andrés Palacio*
                                        Andrés Palacio
                                        Assistant United States Attorney
                                        (718) 254-6215